1  EILEEN M. DECKER
   United States Attorney
2  LAWRENCE S. MIDDLETON
   Assistant United States Attorney
3  Chief, Criminal Division
   DENNISE D. WILLETT
4  Assistant United States Attorney
   Chief, Santa Ana Branch Office
5  GREGORY S. SCALLY (Cal. Bar No. 268073)
   Assistant United States Attorney
6  Santa Ana Branch Office
        8000 United States Courthouse
7       411 West Fourth Street
        Santa Ana, California 92701
8       Telephone: (714) 338-3592
        Facsimile: (714) 338-3506
9       E-mail:    gregory.scally@usdoj.gov

10 Attorneys for Complainant
   UNITED STATES OF AMERICA

11

12              UNITED STATES DISTRICT COURT

13          FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 IN THE MATTER OF THE          CR Misc. No. **SA16-250M**
   EXTRADITION OF
15                                _COMPLAINT_
   FABIAN JALILVAND TEHRANI,
16                                FOR ARREST WARRANT AND
   A Fugitive from the Government  EXTRADITION; ORDER THEREON
17 of GERMANY.
                                   **(UNDER SEAL)**

COPY

UNDER SEAL

FILED
CLERK, U.S. DISTRICT COURT

5/17/2016

CENTRAL DISTRICT OF CALIFORNIA
BY: ___LW___ DEPUTY

LODGED

2016 MAY 16 AM 11: 1
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY

EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Branch Office
GREGORY S. SCALLY (Cal. Bar No. 268073)
Assistant United States Attorney
Santa Ana Branch Office
     8000 United States Courthouse
     411 West Fourth Street
     Santa Ana, California 92701
     Telephone: (714) 338-3592
     Facsimile: (714) 338-3506
     E-mail:   gregory.scally@usdoj.gov

Attorneys for Complainant
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF<br><br>FABIAN JALILVAND TEHRANI,<br><br>A Fugitive from the Government of GERMANY. | CR Misc. No.<br><br>COMPLAINT<br><br>FOR ARREST WARRANT AND EXTRADITION; ORDER THEREON<br><br>**(UNDER SEAL)** |

TO:   Honorable
      United States Magistrate Judge
      Central District of California

     I, GREGORY S. SCALLY, being duly sworn, depose and state that I

am an Assistant United States Attorney for the Central District of

California and act for and on behalf of the Government of GERMANY

pursuant to the Extradition Treaty between the United States of

America and GERMANY signed on June 20, 1978, the Supplementary Treaty

to the Extradition Treaty between the United States of America and

GERMANY, signed October 21, 1986, and the Second Supplementary Treaty

to the Extradition Treaty between the United States of America and

1   GERMANY, signed April 18, 2006 (collectively, the "Extradition

2   Treaty"), with respect to the fugitive, FABIAN JALILVAND TEHRANI

3   ("TEHRANI").

4        In accordance with Title 18, United States Code, Section 3184, I

5   charge on information and belief as follows:

6        1.   That the Government of GERMANY has requested the

7   extradition of the fugitive, a ~~Swiss~~ Swedish national.  A copy of that                GS

8   request for extradition, with related documents from the U.S.

9   Department of State and the American Foreign Service (including a

10  copy of the Extradition Treaty), is attached hereto as Exhibit 1.

11       2.   That I am informed through diplomatic channels that the

12  fugitive is charged in GERMANY with eight counts of the crime of

13  Attempted Collaborative Commercial Fraud, committed concurrently with

14  three counts of Collaborative Commercial Falsification of Documents,

15  in violation of Sections 22, 23, 25, 52, 53, 263, 267, and 78 of the

16  German Criminal Code, a warrant for the arrest of the fugitive for

17  those crimes having been issued on May 7, 2014, by the Local Court of

18  Aachen.

19       3.   That the offense for which the fugitive's extradition is

20  sought is covered by Article 2 and the Schedule annexed thereto of

21  the Extradition Treaty.

22       4.   That the extradition request contains a letter from the

23  Leading Senior Prosecutor in Aachen and a Warrant of arrest from the

24  Local Court of Aachen, from which the following facts may reasonably

25  be derived:

26       Background

27       a.   The investigations began with several money-laundering

28  related suspicious activity reports filed by several banks in the

1  years 2010 and 2011 regarding suspicious cash transactions by TEHRANI

2  and his father, SAEED DJALILVAND TEHRANI ("SAEED TEHRANI" or

3  "TEHRANI's father").  On May 18, 2011, a search was conducted - on

4  the basis of a court decision – of the residential apartment of SAEED

5  TEHRANI in Aachen, Germany, during which it was ascertained that

6  TEHRANI also lived there.  TEHRANI acted as an interpreter for SAEED

7  TEHRANI during the search.   TEHRANI stated he was living in Los

8  Angeles, and his Swedish passport was found.  Within the scope of the

9  search, several computers and data carriers with falsified pay slips,

10  falsified employment contracts, and several bank and credit cards

11  were recovered.   Those documents were analyzed.

12       Cases 1 through 5

13       b.   Both TEHRANI and SAEED TEHRANI disappeared after the

14  search to avoid prosecution.[1]  Through analysis of the recovered

15  documents, it was determined that TEHRANI and SAEED TEHRANI had

16  opened accounts with several bank institutions in the period between

17  October 15, 2009 and June 16, 2010, conducting a fraudulent scheme as

18  follows: they would pretend to be willing to make payments to balance

19  the accounts, but, in accordance with the fraudulent scheme, instead

20  knowingly overdrew the accounts and failed to balance them.   There

21  were several transfers between the accounts of TEHRANI and those of

22  SAEED TEHRANI.   Both TEHRANI and SAEED TEHRANI had unfettered access

23  to each other's computers and falsified documents.   Data files of

24  both TEHRANI and SAEED TEHRANI were found in the computers.   Cases 1

25  through 3 are based on four accounts in the name of SAEED TEHRANI,

---

26

27       [1] SAEED TEHRANI has since been arrested and convicted. He was
arrested in Sweden on October 24, 2012, and ultimately sentenced to
two years of imprisonment by the Regional Court of Aachen on May 23,

28  2013, on four counts of fraud.

1    with deficits of approximately 14,000 euros, 3,500 euros, 60 euros,

2    and 6,900 euros respectively, totaling a deficit of 25,220.79 euros.[2]

3    Cases 4 and 5 are based on two accounts opened by TEHRANI, with

4    deficits of approximately 28,500 euros, 18, 700 euros, and 5,700

5    euros, totaling a deficit of 53,009.24 euros.[3]

6        Case 6

7            c.    Case 6 grows out of a loan for the purchase of a

8    property.   On May 6, 2010, SAEED TEHRANI took out a loan from

9    Sparkasse Aachen, a bank in Aachen, in the amount of 281,000 euros,

10   to purchase a property in Alsdorf, Germany – about 5 miles away from

11   Aachen – from a third, separately-prosecuted individual named KEMAL

12   BIRINCI ("BIRINCI"), for the purchase price of 315,000 euros through

13   a public notary agreement dated March 24, 2010.   In the process,

14   SAEED TEHRANI stated, with deliberate dishonesty, that he was earning

15   a net income of €3020 as an employee of the company "4U Facilities

16   Services Management GmbH."   In support of his false statements, he

---

[2] More specifically, Case 1 is based on an account opened by SAEED TEHRANI on June 16, 2010, at Commerzbank, domiciled in "Frankfurt am Main," which had a negative balance of −€14,570.04 on January 7, 2011, and another account opened at the same bank on the same date by SAEED TEHRANI which had a negative balance of −€3,655.74 on April 12, 2011.

Case 2 is based on an account opened by SAEED TEHRANI on October 19, 2009, at Targobank, domiciled in Dusseldorf, which had a negative balance of −€60.36 on March 15, 2011.

Case 3 is based on an account opened by SAEED TEHRANI on October 15, 2009, at Sparkasse, domiciled in Aachen, which had a negative balance of −€6,934.65 on January 10, 2011.

[3] More specifically, Case 4 is based on an account opened by TEHRANI on March 4, 2010, at Commerzbank, which had a negative balance of −€28,526.26 on March 31, 2011, and another account opened at the same bank on the same date by TEHRANI which had a negative balance of −€18,758.55 on December 13, 2010.

Case 5 is based on an account opened by TEHRANI on March 4, 2010, at Sparkasse, which had a negative balance of −€5,724.34 on March 15, 2011.

1   submitted salary statements from the company that had been

2   manipulated by him and TEHRANI in advance.

3          d.   Immediately after the disbursement of the 281,000 euro

4   loan to BIRINCI on May 12, 2010, however, BIRINCI transferred 105,000

5   euros into an account of TEHRANI, which TEHRANI disposed of in cash.

6   BIRINCI was subsequently interviewed, and BIRINCI stated that the

7   actual selling price for the home was 210,000 euros, and that the

8   public notary agreement was simply to serve the purpose of getting a

9   higher loan from the bank.  Only the initial loan installments were

10  paid by SAEED TEHRANI; further payments were discontinued after the

11  repayment of only 9,429 euros out of the 281,000 euro loan.

12         Case 7

13         e.   On December 2, 2010, at the Targo Bank in Aachen,

14  Germany, SAEED TEHRANI attempted to have his credit limit increased

15  by submitting false pay slips that had been manipulated in advance by

16  SAEED TEHRANI and TEHRANI. The false pay slips were salary statements

17  of the company "4U Facilities Services Management GmbH" and of the

18  successor company "Top Quality Services GmbH," as well as two

19  employment contracts and a statement of income to deliberately feign

20  the existence of an employment relation between SAEED TEHRANI and the

21  "4U" company named above.  In the talks held between SAEED TEHRANI

22  and Targo Bank employees during which SAEED TEHRANI was attempting to

23  obtain the increase in credit limit, TEHRANI acted as an interpreter

24  for SAEED TEHRANI.  Targo Bank did not approve the increase.

25         Case 8

26         f.   SAEED TEHRANI submitted a false statement of earnings

27  showing a high income to purchase a Nissan on January 28, 2011.

28  SAEED TEHRANI obtained a loan amount of 22,699.94 euros with the

1    Nissan Bank to finance the purchase of the Nissan automobile.  SAEED
2    TEHRANI and TEHRANI subsequently paid only a total of €1,509.16 on
3    the loan and discontinued payment.  The involvement of TEHRANI in
4    this case followed the same pattern as the circumstances described
5    above.

6        5.    The fugitive is in this district and therefore within the
7    jurisdiction of this court.  According to the police of Goteberg,
8    Sweden, the mother of TEHRANI stated on August 23, 2012 that TEHRANI
9    was living with a girlfriend in the United States.  On May 5, 2014,
10   Interpol Washington reported that a person that is likely to be
11   TEHRANI had filed an immigration application with the Department of
12   Homeland Security.

13       6.    Based on my discussions with United States Marshal Service
14   Deputy Marshal Neftali Martinez and my review of his Report of
15   Investigation, it appears to me that as of February 2015, Fabian
16   Jalilvand Tehrani - i.e., TEHRANI - a male, had two vehicles
17   registered to his name with the California Department of Motor
18   Vehicles ("DMV"), each with a registration address of 18307 Burbank
19   Boulevard, Unit 219, Tarzana, California, 91356.  As of April 5,
20   2016, TEHRANI has one vehicle registered at the above address, with
21   registration due to expire on June 28, 2016.

22       7.    TEHRANI also has a driver's license with the California DMV
23   issued on July 29, 2015, that is still valid, and that lists his date
24   of birth as 09/20/1977, the same as on GERMANY's arrest warrant.  On
25   February 13, 2015, Deputy Martinez interviewed a maintenance manager
26   at the above address in Tarzana, California, and the manager
27   confirmed that TEHRANI was living at the above address.  On April 5,

28

1   2016, Deputy Martinez again interviewed the maintenance manager, who

2   confirmed that TEHRANI is still living at the above address.

3      8.    The arrest warrant identifies TEHRANI by the name of

4   "Fabian Jalilvand Tehrani, born on September 20, 1977 in Teheran,

5   presently without permanent residence, Swedish citizen."

6      WHEREUPON, complainant requests that a warrant be issued, based

7   on probable cause, pursuant to Title 18, United States Code, Section

8   3184, for the arrest of FABIAN JALILVAND TEHRANI; that FABIAN

9   JALILVAND TEHRANI be brought before this Court and the evidence of

10   criminality heard; that if on such hearing this Court deems the

11   evidence sufficient under the provisions of the Extradition Treaty to

12   sustain the charge, the Court certify the same to the Secretary of

13   State in order that a warrant may issue for the surrender of FABIAN

14   JALILVAND TEHRANI to the appropriate authorities of the requesting

15   state, GERMANY, according to the Extradition Treaty; and that this

16   Court take such other actions as this Court is required to take under

17   //

18   //

19

20

21

22

23

24

25

26

27

28

1   the provisions of the Extradition Treaty and the laws of the United

2   States to meet the obligations of the Extradition Treaty.

3   DATED: This 16th day of May, 2016, at Santa Ana, California.

4                                          Respectfully submitted,

5                                          EILEEN M. DECKER
                                           United States Attorney
6
                                           LAWRENCE S. MIDDLETON
7                                          Assistant United States Attorney
                                           Chief, Criminal Division
8

9                                                    |s|
                                           _____
                                           GREGORY S. SCALLY
10                                         Assistant United States Attorney

11                                         Attorneys for Complainant
                                           UNITED STATES OF AMERICA
12

13  Subscribed and sworn to before
    me this 16th day of May, 2016.
14

15              |s|
    _____
16  UNITED STATES MAGISTRATE JUDGE
        KAREN E. SCOTT

17

18

19

20

21

22

23

24

25

26

27

28

**INTRADUCT®**   Fachübersetzungen · Dolmetscherdienst

Postfach 10 17 10 · 44017 Dortmund · Tel. +49 (231) 95 20 45-0 · info@intraduct.de

The Leading Senior Prosecutor
in Aachen



The Leading Senior Prosecutor, P. O. Box 10 17 16, 52017 Aachen

To the
Competent judicial authority
in the United States

Date: June 25, 2014
Page 1 of 8

Our reference:
**903 AR 57/12**
**(804 Js 1052/11)**
(Please quote in all correspondences)

**Telephone +49 241 9425 – 53103**
**Facsimile  +49 241 9425 – 83112**

## Request for the extradition
## of the Swedish citizen
## Fabian Jalilvand Tehrani

I.

I, Helmut Hammerschlag, am a citizen of the Federal Republic of Germany and have been serving as a leading senior prosecutor in the state of North Rhine Westphalia in the city of Aachen since November 28, 2013. My present official duties include the criminal prosecution of people that are accused of violating the provisions of the criminal laws of the Federal Republic of Germany.

In the course of exercising my official duties as a leading senior prosecutor, I have — within the scope of extensive investigations on suspicion of commercial fraud and the commercial falsification of documents — become aware of accusations and evidences in the investigative proceedings bearing the reference number 804 Js 1052/11 conducted by my office against the Swedish citizen

Fabian Jalilvand Tehrani
born on September 20, 1977 in Teheran/Iran,

that I am handling.

With this request, we are applying for the extradition of the wanted person Fabian Jalilvand Tehrani, from the United States for the purpose of prosecution including the subsequent main hearings before the com-

House and Delivery address
- Justizzentrum Aachen -
Adalbertsteinweg 92
52070 Aachen
Telephone: 0241 9425 - 0
Fax:       0241 9425 - 83149
verwaltung@sta-aachen.nrw.de
www.sta-aachen.nrw.de

Consultation hours: Mon. – Fri.
08:30 – 12:00, Mon – Thurs, 14:00
– 15:00 and Fri. 14:00 – 14:30 hrs

Public means of transport:
ASEAG, also Lines 12, 23, 55
to Josefskirche/Justizzentrum

EXHIBIT 1

INTRADUCT®   Fachübersetzungen · Dolmetscherdienst

Postfach 10 17 10 · 44017 Dortmund · Tel. +49 (231) 95 20 45 0 · info@intraduct.de



The Leading Senior Prosecutor
in Aachen

petent court of jurisdiction.

## II.

The investigations were triggered by several money laundering-related suspicious activity reports filed by several banks in the years 2010 and 2011, which indicated that the bank accounts of the wanted person Fabian Jalilvand Tehrani and his father, the separately prosecuted Saeed Djalilvand Tehrani, showed conspicuous cash transactions. Moreover, it was uncovered amongst others, that the separately prosecuted Saeed Djalilvand Tehrani financed a loan agreement reached with Sparkasse Aachen (Thrift Institution of Aachen) on May 06, 2010, for the purchase of a house in Alsdorf using falsified pay slips and a falsified employment contract, whereby the price of the object was clearly considered excessively overcharged.

On May 18, 2011, the then residential apartment of the separately prosecuted Saeed Djalivand Tehrani that was located in Altenberger Strasse 4, in Aachen was searched on the basis of a court decision. It was successfully ascertained in the process that the wanted person Fabian Jalilvand Tehrani was also residing there. The wanted person Fabian Jalilvand Tehrani initially identified himself by means of a British driver's license and stated that he was living in Los Angeles where he allegedly worked as a film producer. During the course of the search conducted in the apartment, the Swedish passport of the wanted person Fabian Jalilvand Tehrani (passport number 81099447) was found and it contained no entry stamp into the United States. No legal professional activity in Germany could be ascertained. Extensive items of evidence were seized within the scope of the search particularly several computers and data carriers with falsified pay slips and falsified employment contracts as well as several bank and credit cards.

The evaluation of the extensive documents uncovered that the wanted person Fabian Jalilvand Tehrani and the separately prosecuted Saeed Djalivand Tehrani had opened accounts with several bank institutions in the period from October 15, 2009 to June 16, 2010 pretending to be willing to make payments, overdrew the accounts and failed to balance them up in accordance with their premeditated *modus operandi* (cases 1 to 5). The accounts of the separately prosecuted Saeed Djalilvand

**INTRADUCT**®   Fachübersetzungen · Dolmetscherdienst

Postfach 10 17 10 · 44017 Dortmund · Tel. +49 (231) 95 20 45 0 · info@intraduct.de



The Leading Senior Prosecutor
in Aachen

Tehrani last showed a deficit balance of EUR 25,220.79 (cases 1 to 3). The respective accounts that were opened by the wanted person Fabian Jalilvand Tehrani on March 04, 2010 had a deficit account balance of EUR 53,009.24 (cases 4 and 5). The suspicion that the wanted person Fabian Jalilvand Tehrani and his father had always acted in concert was initially unveiled in the joint apartment, in which they both had unfettered access to each other's computers and (falsified) documents respectively. Data files of both respective accomplices were found in the computers. There were also several transfers between the accounts of the accomplices. Finally, the wanted person Fabian Jalilvand Tehrani functioned as an interpreter for his father within the scope of the search as well as in one other case (case 7). It is also worthy of notice that both accomplices disappeared after the search to avoid prosecution.

Regarding the purchase of the property mentioned above (case 6), it could be ascertained that the father of the wanted person Fabian Jalilvand Tehrani had concluded a loan agreement with the Sparkasse of Aachen on May 06, 2010 covering an amount of EUR 281,000.00 by feigning solvency and willingness to pay back, for the purpose of financing a property in Hauptstrasse 64-66 in Alsdorf, which was purchased from the separately prosecuted Kemal Birinci at a price of EUR 315,000.00 by virtue of a public notary agreement dated March 24, 2010. For this purpose, he submitted fake pay slips confirming that he was earning higher net wages. Immediately after the disbursement of the loan however, the separately prosecuted Kemal Birinci transferred back the amount of EUR 105,000.00 to the account of the wanted person Fabian Jalilvand Tehrani in Commerzbank. In the subsequent period, the wanted person Fabian Jalilvand Tehrani disposed of the money largely in cash. The separately prosecuted Kemal Birinci stated within the scope of his subsequent interrogation that he sold the house at a price of EUR 210,000.00 and that the public notary agreement was to simply serve the purpose of getting a higher amount of loan from the bank. As premeditated by the parties from the very start, only the initial loan installments were paid; further payments were discontinued after the repayment of EUR 9,429.00.

It was also ascertained that the father of the wanted person Fabian Jalilvand Tehrani attempted to have his credit limit increased at the TARGO Bank in Großkölnstrasse 64 – 66 in Aachen by feigning sol-

# INTRADUCT®

Fachübersetzungen · Dolmetscherdienst

Postfach 10 17 10 · 44017 Dortmund · Tel. +49 (231) 95 ... info@intraduct.de



**The Leading Senior Prosecutor
in Aachen**

vency and a willingness to pay back (case 7). Again, he submitted pay slips for this purpose that had been manipulated in advance by him and the wanted person for the purpose of deliberately and dishonestly feigning a non-existent employment status. As was done in other cases and during the search, the wanted person acted as an interpreter for his father.

It could be finally ascertained that the separately prosecuted Saeed Djalilvand Tehrani purchased a private car (Nissan Juke) on January 28, 2011 and also concluded a loan agreement with the Nissan Bank covering the loan amount of EUR 22,699.94 to finance the purchasing price by feigning solvency and his willingness to pay back; here again, he submitted a falsified statement of earnings to feign an existing employment status with the respective high income. The involvement of the wanted person Fabian Jalilvand Tehrani in this case also followed the same pattern as the circumstances that have already been described above.

The separately prosecuted Saeed Djalilvand Tehrani was successfully arrested in Malmö/Sweden and subsequently handed over to my office on October 24, 2012 on the basis of the manhunt triggered by my office on September 27, 2012. In the appeal proceedings, he was finally condemned to an overall sentence of two years imprisonment in a legally enforceable manner, by the Regional Court of Aachen through the judgment of May 23, 2013 – 72 Ns 43/13 – on four counts of fraud. The other cases described were stayed for reasons of expediency. The judgment was also a confirmation of the investigations as they relate to the wanted person Fabian Jalilvand Tehrani even though his father largely invoked his right to maintain sealed lips during the proceedings.

Investigations on the place of residence of the wanted person Fabian Jalilvand Tehrani have uncovered that he is living in the United States. According to the police of Göteborg/Sweden, the mother of the wanted person stated on August 23, 2012 that her son was living with a girlfriend in the United States and was using the telephone number 0016077349189. On May 05, 2014, Interpol Washington (REF.: 20120929605/CRK) reported that a person that is likely to be the wanted person had filed an immigration application with the Department of Homeland Security (DHS). On June 20, 2014, my office finally received

**INTRADUCT**®     Fachübersetzungen · Dolmetscherdienst

Postfach 10 17 10 · 44017 Dortmund · Tel. +49 (231) 95 20 45 · info@intraduct.de

The Leading Senior Prosecutor
in Aachen



information confirming that the person has now been identified and localized.

### III.

On May 07, 2014, the Local Court of Aachen issued a warrant of arrest with the reference number 621 Gs 641/14, which states that the wanted person Fabian Jalilvand Tehrani is charged with the offense of (attempted) collaborative commercial fraud on eight counts – committed concurrently with – the offense of collaborative commercial falsification of documents on three counts. This warrant of arrest now substitutes the previous warrant of arrest issued by the Local Court of Aachen and dated June 05, 2012, which does not formally meet the prerequisites of the extradition proceedings. A certified copy of the warrant of arrest of the Local Court of Aachen dated May 07, 2014 (621 Gs 641/14) is attached to this request.

### IV.

The provisions of the criminal laws of the Federal Republic of Germany that are relevant to the charges in this case will be listed below. The regulations were in force and valid at the time the offenses were committed and the warrant of arrest was issued. They still remain fully in force and valid.

**Section 22 of the German Penal Code (Attempt)**
A criminal offense is deemed attempted when a person directly sets out to realize the criminal act as planned and conceived.

**Section 23 of the German Penal Code (Punishability of attempts)**
(1) The attempt to commit a crime shall always be punishable, while the attempt to commit an offense shall be punishable if the law so demands explicitly.
(2) and (3) ...

**Section 25 of the German Penal Code (Perpetration)**
(1) ...
(2) Should several persons commit the crime collaboratively, each person shall be punished as a perpetrator (Accomplices).

**INTRADUCT**®      Fachübersetzungen · Dolmetscherdienst

Postfach 10 17 10 · 44017 Dortmund · Tel. +49 (231) 95  o@intraduct.de

The Leading Senior Prosecutor
in Aachen

### Section 52 of the German Penal Code (Concurrence of offenses)

(1) Should one act violate several criminal laws or the same criminal law on multiple basis, only one punishment shall be recognized.

(2) Should several criminal laws be violated, the punishment shall be determined in accordance with the law threatening the most severe punishment. It shall not be milder than permitted by the other applicable laws.

(3) and (4) ...

### Section 53 of the German Penal Code (Multiplicity of offenses)

(1) Should someone have committed several criminal offenses that can all be adjudged at the same time and thereby lead to several imprisonments or fines, only one overall punishment shall be accepted.

(2) to (4) ...

### Section 263 of the German Penal Code (Fraud)

(1) Whoever damages the property of another by feigning wrong facts or distorting true facts and arouses or maintains a faulty situation with the intention of acquiring property advantage for himself/herself or another third party shall be punished by up to five years imprisonment or a fine.

(2) ...

(3) In particularly severe cases, the punishment shall be an imprisonment of six months to ten years. Basically, a particularly severe case shall be deemed given if the offender

   1. acts commercially or as a member of a gang that was formed for the purpose of the continued perpetration of fraud or the falsification of documents,

   2. to 5 ..

(4) to (7) ....

### Section 267 of the German Penal Code (Falsification of documents)

(1) Whoever produces a fake document, falsifies a genuine document or uses a fake or falsified document for the pur-

**INTRADUCT** ®

Fachübersetzungen · Dolmetscherdienst

Postfach 10 17 10 · 44017 Dortmund · Tel. +49 (231) 95 ... ... o@intraduct.de



The Leading Senior Prosecutor
in Aachen

pose of deception in legal transactions shall be punished by imprisonment of up five years or a fine.

(2) …

(3) In particularly severe cases, the punishment shall be an imprisonment of six months to ten years. Basically, a particularly severe case shall be deemed given if the offender

   1. acts commercially or as a member of a gang that was formed for the purpose of the continued perpetration of fraud or the falsification of documents,

   2. – 4 …

(4) …

The provisions of the criminal laws of the Federal Republic of Germany, in which the statutory limitation for the criminal offenses, for which the wanted person stands accused, is regulated, are listed below. They equally remain fully in force and valid.

### Section 78 of the Penal Code (Period of statutory limitation)

(1) Statutory limitation shall exclude the punishment of offenses and the ordering of actions Section 11, subsection 1, item 8).
   …

(2) …

(3) In case of the statutory limitation or prosecution, the period of limitation shall be

   1. – 3. …

   4. five years for offenders that are threatened in maximum cases, with imprisonment of more than one year to five years,

   5. …

(4) The period shall be based on the punishment threatened by the law, whose elements constitute the offense without regard for aggravations or mitigations that are designated in accordance with the regulations of the general part or for particularly severe or less severe cases.

### Section 78 c of the Penal Code (Interruption)

(1) Statutory limitation shall be interrupted through

   1. to 4. …

# INTRADUCT®

Fachübersetzungen · Dolmetscherdienst

Postfach 10 17 10 · 44017 Dortmund · Tel. +49 (231) 95 20 45 · info@intraduct.de



The Leading Senior Prosecutor
in Aachen

Page 8 of 8

    5. warrant of arrest, order of commitment to a health institu-
tion, writ of attachment and court decisions upholding
them,
    6. to 12 …

V.

A photocopy of the passport (also submitted to the respectively de-
frauded banks) of the wanted person Fabian Jalilvand Tehrani is at-
tached to this request. Finger prints or deoxyribonucleic acid profile of
the wanted person are not available to us.

VI.

I hereby declare to the best of my knowledge that the foregoing is the
truth. Given the above submissions, I humbly apply on behalf of the
Federal Republic of Germany, for the extradition of the Swedish citizen

Fabian Jalilvand Tehrani
born on September 20, 1977 in Teheran/Iran,

for the purpose of prosecution.

I have done my utmost to provide all relevant information that is re-
quired for the approval of the extradition request.

Should the US authorities deem further information necessary with re-
gards to the approval of the request, I humbly ask to be granted the
opportunity to provide the required additional information before a final
decision is taken on the issue.

pp
Signed: (Signature illegible)
(Fuchs)

Round stamp imprint:
The Leading Senior Prosecutor/
(Emblem) / in Aachen

## Attachments

1. Warrant of arrest of the Local Court of Aachen dated May 07, 2014
2. Photocopy of passport

Bochum, June 26, 2014

I hereby certify the foregoing to be a true and
correct translation from German into English

# NTRADUCT®                    Fachübersetzungen · Dolmetscherdienst

Postfach 10 17 10 · 44017 Dortmund · Tel. +49 (231) 95 20 45-0 · info@intraduct.de

| | | |
|---|---|---|
| Local Court of Aachen | Aachen, | May 07, 2014 |

| | | |
|---|---|---|
| Adalbertsteinweg 92 | Exchange: | 0241/9425-0 |
| 52070 Aachen | Officer-in-charge: | 0241/9425-30262 |
| | Facsimile: | 0241/942580001 |

Reference number: (Please quote in all correspondences!)
621 Gs-901 Js 1052/11-641/14

## Warrant of arrest

Confinement to investigative custody has been ordered

against the accused person

        Fabian Jalilvand Tehrani,
        born on September 20, 1977 in Teheran,
        presently without permanent residence,
        Swedish citizen

with the concurrent annulment of the warrant of arrest dated June 05, 2012 (Reference number 621 Gs 651/12).

He is being accused
of damaging the property of a third party
in the period from October 15, 2009 to April 12, 2011
in Aachen and other locations

in 8 independent offenses

in collusion with the separately prosecuted Saeed Djalilvand Tehrani

with the intention of unlawfully acquiring pecuniary gains for himself or a third party by provoking a mistake in the aftermath of a fraudulent misrepresentation and ended up acting commercially leaving it at a mere attempt in one case (case 7)

and executing three cases (cases 6-8) concurrently with the above

INTRADUCT®     Fachübersetzungen · Dolmetscherdienst

Postfach 10 17 10 · 44017 Dortmund · Tel. +49 (231) 95 20 45-0 · info@intraduct.de

by providing a forged document for the purpose of deception in legal transaction while acting on commercial basis.

Cases 1 – 5:
The accused Fabian Jalilvand Tehrani and his father Saeed Djalilvand Tehrani opened several bank accounts following a jointly conceived plan of criminal action by fraudulently indicating their willingness to make payment with the intention of subsequently overdrawing the accounts in a concerted action without balancing them and thus jointly acquiring pecuniary benefits.

Details of the offenses are as follows:

a)     Accounts opened in the name of the separately prosecuted Saeed Djalilvand Tehrani

| Case | Bank | Domicile | Account | Opened on: | Acct. bal. (EUR) | Date |
|------|------|----------|---------|------------|------------------|------|
| 1 | Commerzbank | Frankfurt am Main | 613/115622300 5232249001958711 | 16.06.10 16.06.10 | -14,570.04 -3,655.74 | 07.01.11 12.04.11 |
| 2 | Targobank | Düsseldorf | 4509470007283222 (VISA) | 19.10.09 | -60.36 | 15.03.11 |
| 3 | Sparkasse | Aachen | 1070499114 | 15.10.09 | -6,934.65 | 10.01.11 |

b)     Accounts opened in the name of the accused Fabian Jalilvand Tehrani:

| Case | Bank | Domicile | Account | Opened on: | Acct. bal. (EUR) | Date |
|------|------|----------|---------|------------|------------------|------|
| 4 | Commerzbank | Frankfurt am Main | 613/115622300 5232249001958711 | 04.03.10 04.03.10 | -28,526.26 -18,758.55 | 31.03.11 13.12.10 |
| 5 | Sparkasse | Aachen | 1070573454 | 04.03.10 | -5,724.34 | 15.03.11 |

Case 6:

On May 06, 2010, the separately prosecuted Saeed Djalilvand Tehrani concluded a loan agreement (Number 6751364701) with Sparkasse Aachen, Friedrich-Wilhelm-Platz 1 – 4, covering EUR 281,000.00 that was paid out on May 12, 2010 following a plan of criminal action that was jointly conceived with the accused person Fabian Jalilvand Tehrani by fraudulently indicating the ability and the willingness to make payment, for the purpose of

**INTRADUCT®**   Fachübersetzungen · Dolmetscherdienst

Postfach 10 17 10 · 44017 Dortmund · Tel. +49 (231) 95 20 45-0 · info@intraduct.de

financing a real estate object in Hauptstrasse 64 – 66, in Alsdorf that was purchased by virtue of a notary-certified purchase agreement dated March 24, 2010, by the separately prosecuted Birinci and his spouse, the witness Hayriye Birinci at a price of EUR 315,000.00. In the process, the separately prosecuted Saeed Djalilvand Tehrani stated in deliberate dishonesty and in accordance with the jointly conceived criminal plan that he was earning a net income of EUR 3,020.00 as an employee of the company 4U Facilities Services Management GmbH. To underscore these inaccurate statements, he submitted salary statements from the company 4U Facilities Services Management GmbH that were manipulated in advance by him and the accused Fabian Jalilvand Tehrani, in which the net salary was consistently shown as EUR 3,020.00 even though gross salary had been adjusted. According to the plan of criminal action, the separately prosecuted Birinci remitted back an amount of EUR 105,000.00 into the bank account of the accused Fabian Jalilvand Therani number 6131057322 with Commerzbank immediately after the disbursement of the loan of EUR 281,000.00 on May 12, 2010. The separately prosecuted Saeed Djalilvand Tehrani subsequently paid only the initial seven installments of the loan amounting to EUR 1,347.00 each and totaling EUR 9,429.00 as intended from the very beginning, by him and the accused Fabian Jalilvand Tehrani and subsequently discontinued payment completely.

Case 7:

On December 02, 2010 at about 12:10 hrs, the separately prosecuted Saeed Djalilvand Tehrani applied to Targo Bank in Großkölnstraße 64 – 66 in Aachen for an increase of the credit limit of his credit card No. 4509470007283222 from EUR 1,000.00 to EUR 5,000.00 in accordance with the criminal action that was planned in advance with the accused Fabian Jalilvand Tehrani by fraudulently indicating his willingness and ability to make payment. In the process, he – once again – submitted salary statements of the company 4U Facilities Services Management GmbH and of the successor company Top Quality Services GmbH, that were manipulated by him and the accused Fabian Jalilvand Tehrani preparatory to the submission and consistently showing a net salary of EUR 3,020.00 in spite of adjusted gross salary, as well as two employment contracts with the company 4U Facilities Services Management GmbH dated October 09, 2009 and a statement of income from the company 4U Facilities Services Management GmbH dated February 17, 2010, to deliberately and dishonestly feign the existence of an employment relation. In the talks held between the separately prosecuted Saeed Jalilvand Tehrani and staffs of Targo Bank to realize an increase in the credit card limit, the accused Fabian Jalilvand Tehrani acted as an interpreter. Targo Bank however did not approve the increase.

Case 8:

On January 28, 2011, the separately prosecuted Djalilvand Tehrani bought a private car

# INTRADUCT®   Fachübersetzungen · Dolmetscherdienst

Postfach 10 17 10 · 44017 Dortmund · Tel. +49 (231) 95 20 45-0 · info@intraduct.de

of the brand Nissan Juke with the official registration number AC-AH5094, from the company Automobilgruppe Dirkes Bonn GmbH in Bonn, Godesberger Straße 60 – 80. At the same time, the separately prosecuted Saeed Djalilvand Tehrani concluded a loan agreement covering the sum of EUR 22,699.94 with Nissan Bank domiciled in Mönchengladbach to facilitate the financing of the purchasing price by fraudulently misrepresenting his intentions to feign his willingness and ability to make payments, all on the basis of the criminal plan that was jointly conceived with the accused Fabian Jalilvand Tehrani. With the collaboration of the accused Fabian Jalilvand Tehrani, he submitted to Nissan Bank in this respect, a falsified statement of income from the company Top Quality Service GmbH dated December 20, 2010 to deliberately and dishonestly feign an existing working relation with the respective level of high income. As intended from the very beginning, they subsequently paid only the first four installments of the loan amounting to a total of EUR 1,509.16 and discontinued payment completely thereafter.

With the repeated commitment of the type of criminal offenses described above, the accused Fabian Jalilvand Tehrani acted on each occasion, with the intention of securing a source of income of sort in a specific scope on a permanent basis.

These actions are offenses of collusive (attempted) commercial fraud and the collusive commercial falsification of documents is punishable by sections 263, subsections 1 and 3, item 1, 267, subsections 1 and 3, item 1, 22, 23, 25; subsection 2, 52, 53 of the Penal Code.

He is strongly suspected of committing this offense on the basis of the results of investigations that have been carried out so far particularly in the aftermath of the information provided by the bank on the conclusion of the respective agreements and the bookings that were made: The separately prosecuted Saeed Djalilvand Tehrani has already been sentenced in a legally-binding manner, on the basis of a large part of the above-mentioned criminal offenses.

The statute of limitation has not yet set in for prosecution

The verbatim content of the aforementioned criminal provisions is as follows:

Section 22 of the German Criminal Code (Terminology): A criminal offense is deemed committed by whoever sets out to realize the offense after previously imagining the commitment of such an offense.

Section 23 of the German Criminal Code (Punishability of the attempt)

# INTRADUCT®

Fachübersetzungen · Dolmetscherdienst

Postfach 10 17 10 · 44017 Dortmund · Tel. +49 (231) 95 20 45-0 · info@intraduct.de

(1) The attempt to commit an offense is always punishable, the attempt to commit an offense is given only if the statute explicitly specifies same.
(2) and (3) …

Section 25 of the German Penal Code (Perpetration of an offense):

(1) …
(2) Should several persons commit the offense in a collusive manner, each individual will be punished as an offender (accomplice).

Section 52 of the German Penal Code (Concurrence of offenses):
(1) Should the offences be in violation of several criminal statutes or the same criminal statute severally, it will be reduced to a single penalty.
(2) Should several criminal statutes have been violated, the penalty will be determined on the basis of the statute that threatens the heaviest penalty. It shall not be milder than permitted by the other applicable statutes.
(3) and (4) …

Section 53 of the German Criminal Code (Multiplicity of offenses)
(1) Should one person have committed several criminal offenses that are judged at the same time and which result in several imprisonments or several fines, they will be reduced to one overall punishment.
(2) to (4) …
(1) Whoever commits the criminal offense personally or through another person, will be punished as a criminal offender.
(2) Should several persons have committed the criminal offense in a collusive manner, each person will be punished as a criminal offender (accomplice).

Section 263 of the German Criminal Code (Fraud)
(1) Whoever damages the property of a third party by inciting and maintaining an error through the fraudulent misrepresentation or distortion or suppression of real facts with the intention of unlawfully acquiring pecuniary benefits for himself/herself or another third party, shall be subjected to punishment by an imprisonment of up to five years or a fine.
(2) …
(3) In particularly serious cases, the punishment shall be an imprisonment of six months to

**INTRA**DUCT®     Fachübersetzungen · Dolmetscherdienst

Postfach 10 17 10 · 44017 Dortmund · Tel. +49 (231) 95 20 45-0 · info@intraduct.de

ten years. A particularly serious case shall usually be deemed given if a criminal offender acts
1. on commercial basis or as the member of a gang that is formed for the purpose of continually committing fraud or the forgery of documents,
2. to 5. ...
(4) to (7) ...


Section 267 of the German Penal Code (Forgery of documents):
(1) Whoever creates a non-authentic document, falsifies an authentic document or uses a non-authentic or falsified document for the purpose of deception in legal transaction shall be subjected to punishment by imprisonment of up to five years or a fine.
(2) ...
(3) In particularly serious cases, the penalty shall be an imprisonment of six months to ten years. A particularly serious case shall basically be deemed given if the offender acts
1. on commercial basis or as the member of a gang that is formed for the purpose of continually committing fraud or the forgery of documents,
2. to 4. ...
(4) ...


Section 78 of the Penal Code (Period of the statute of limitation)
(1) The statute of limitation excludes the punishment of an offense and the ordering of measures
     § 11, subsection 1, item 8). [...]
(2) [...]
(3) Should the prosecution be covered by the statute of limitation, the period of the statute of limitation shall be
     1.-3. [...]
     4. five years for offenses that are threatened with the maximum imprisonment in excess of one year and up to five years.
     5. [...]
(4)     The period shall be based on the penalty threatened by the statute, whose defined elements of crime establish the offense without consideration for intensifications or mitigations as are provided for in accordance with the regulations of the general aspect or for particularly serious or less serious cases.


There is a reason to keep him in custody to prevent escape in accordance with section § 112, subsection 2, item 1 of the Code of Criminal Proceedings because the accused is on the run.

# INTRADUCT®

Fachübersetzungen · Dolmetscherdienst

Postfach 10 17 10 · 44017 Dortmund · Tel. +49 (231) 95 20 45-0 · info@intraduct.de

The accused Fabian Jalilvand Tehrani is presently of unknown residence after search operations were previously carried out against him and his accomplice in this case. The accused Fabian Jalilvand Tehrani is thus on the run from criminal proceedings.

The principle of proportionality is given in ordering the confinement to investigative custody in the face of the amount of damages involved.

Signed: (Signature illegible)          Round stamp imprint:
Esselborn                              LOCAL COURT OF AACHEN/(Emblem)/186
Judge of the Local Court

Bochum, May 08, 2014

I hereby certify the foregoing to be a true and correct translation from German into English





DISTRICT OF COLUMBIA, ss:

<u>DECLARATION OF ELIZABETH M. KIINGI</u>

I, Elizabeth M. Kiingi, declare and say as follows:

1. I am an Attorney-Adviser in the Office of the Legal Adviser of the Department of State, Washington, D.C. This office has responsibility for extradition requests, and I am charged with the extradition case of Fabian Jalilvand Tehrani. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. In accordance with the provisions of the extradition treaties in full force and effect between the United States of America and the Federal Republic of Germany, the Embassy of the Federal Republic of Germany has submitted Diplomatic Note number 114/2014, dated August 12, 2014, requesting the extradition of Fabian Jalilvand Tehrani. A copy of the diplomatic note is attached to this declaration.

3. The relevant and applicable treaty provisions in full force and effect between the United States of America and the Federal Republic of Germany are found in the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, signed on June 20, 1978 ("the 1978 Treaty"), the Supplementary Treaty to the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, signed October 21, 1986 ("the 1986 Supplementary Treaty"), and the Second Supplementary Treaty to the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, signed on April 18, 2006 (the "2006 Second Supplementary Treaty"). Copies of the treaties are attached to this declaration.

4. In accordance with Article 30 of the 1978 Treaty, the Government of the United States represents the interests of Germany in proceedings in U.S. courts arising out of extradition

15024012-2

# United States of America



## DEPARTMENT OF STATE

### *To all to whom these presents shall come, Greetings:*

I certify that Elizabeth M. Kiingi, whose name is subscribed to the document hereunto annexed, was at the time of subscribing the same Attorney Adviser, Office of the Legal Adviser, Department of State, United States of America, and that full faith and credit are due to her acts as such.

*This certificate is not valid if it is removed or altered in any way whatsoever*

In testimony whereof, I, John F. Kerry, Secretary of State , have hereunto caused the seal of the Department of State to be affixed and my name subscribed by the Assistant Authentication Officer, of the said Department, at the city of Washington, in the District of Columbia, this seventeenth day of March, 2015.

_____
Secretary of State

By _____

Assistant Authentication Officer,
Department of State

*Issued pursuant to CHXIV, Stat*
*Sept. 15      1 Stat. 68-69;*
*USC 26      USC 2651a; 5 U*
*301; 28      733 et. seq.; 8 U*
*1443(f);      44 Federal Rules*
*Civil Pro*

-2-

requests made by Germany, and Germany provides similar representation in its courts for extradition requests made by the United States.

5.  The offenses for which extradition is sought are covered by Article 2 of the 1978 Treaty, as amended by Article 1 of the 1986 Supplementary Treaty.

6.  Under Article 29 of the 1978 Treaty, as amended by Article 6 of the 2006 Second Supplementary Treaty, documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State are admissible in extradition proceedings without further certification, authentication or other legalization. Therefore, such documents satisfy the authentication requirements for extradition without the need for certification by the U.S. Embassy in Berlin.  Germany, in submitting documents in the instant case that bear the certificate or seal of the Ministry of Justice, has complied with the treaty's provision on authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on March 17, 2015.


ELIZABETH M. KIINGI

Attachments:
    1.    Copy of note
    2.    Copy of treaties

Embassy
of the Federal Republic of Germany
Washington

RK 531 SE Tehrani

L/LEI
DEPARTMENT OF STATE

2014 AUG 12  P 2: 11

## *Note Verbale 114/2014*

The Embassy of the Federal Republic of Germany presents its compliments to the U.S. Department of State and has the honor to transmit to the U.S. Government the extradition documents, affixed with string and seal, of the Leading Senior Prosecutor in Aachen/Germany, in accordance with Article 29 of the Extradition Treaty of June 20, 1978, between the Federal Republic of Germany and the United States of America, as amended in the second supplementary agreement of April 18, 2006.

The Government of the Federal Republic of Germany asks the Government of the United States of America to take the Swedish citizen Fabian Jalilvand Tehrani born in Teheran/Iran, on September 20, 1977, into temporary custody for the crime underlying the arrest warrant dated May 07, 2014 (file no.: 621 Gs 641/14) and to subsequently extradite him to Germany and, upon extradition, to inform the German authorities of how long the wanted person was held in custody in the United States solely due to the extradition request. The wanted person is possibly residing in the U.S. The Interpol Washington Office (ref. no.: 20120929605/CRK) informed that Mr. Tehrani presumably had filed a naturalization application with the Department of Homeland Security, A copy of his Swedish passport is attached.

The Embassy furthermore advises that charges were brought before the Local Court of Aachen against the wanted person on (attempted) collaborative commercial fraud on eight counts committed concurrently with the offense of collaborative commercial falsification of documents in three counts, for the crimes underlying the arrest warrant dated May 07, 2014 (file no.: 621 Gs 641/14).

It is possible to have the wanted persons picked up by German criminal police officers in the United States and to transfer them directly by air from the U.S. to Germany, at the expense of the German prosecuting authorities.

All additional information about the identity of the wanted person will be transmitted as it becomes available.

If the U.S. Government consents to the extradition, it is suggested that the wanted person be transferred by air at the expense of the German prosecuting authorities.

A copy of this Note Verbale and its judicial documents are included for the U.S. Department of Justice.

The Embassy of the Federal Republic of Germany avails itself of this opportunity to renew to the U.S. Department of State the assurances of its highest consideration.

Washington, D.C., August 12, 2014

United States
    Department of State
        Washington, D.C.

Second Supplementary Treaty

to

the Treaty between the United States of America

and

the Federal Republic of Germany

Concerning Extradition

2

The Government of the United States of America

and

the Government of the Federal Republic of Germany,

As contemplated by Article 3, paragraph (2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003 (hereafter "the U.S.-EU Extradition Agreement"),

Acknowledging that in accordance with the provisions of this Second Supplementary Treaty, the bilateral Treaty between the United States of America and the Federal Republic of Germany Concerning Extradition signed 20 June 1978 as amended by the Supplementary Treaty to the Treaty between the United States of America and the Federal Republic of Germany Concerning Extradition signed 21 October 1986 (hereafter referred to as "the bilateral extradition treaty") is applied in the manner set forth in Article 3 of the U.S.-EU Extradition Agreement,

Have agreed as follows:

Article 1

Pursuant to Article 13 of the U.S.- EU Extradition Agreement, Article 12 of the bilateral extradition treaty is amended to read as follows:

3

"Article 12

Capital Punishment

Where the offense for which extradition is sought is punishable by death under the laws in the Requesting State and not punishable by death under the laws in the Requested State, the Requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the Requesting State, on condition that the death penalty if imposed shall not be carried out. If the Requesting State accepts extradition subject to conditions pursuant to this Article, it shall comply with the conditions. If the Requesting State does not accept the conditions, the request for extradition may be denied."

Article 2

Pursuant to Article 14 of the U.S.- EU Extradition Agreement, the following text is inserted into the bilateral extradition treaty as Article 15 bis:

"Article 15 bis

Sensitive information in a request

Where the Requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the Requested State to determine the extent to which the information can be protected by the Requested State. If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted."

Article 3

Pursuant to Article 6 of the U.S.-EU Extradition Agreement, the following text is added to the bilateral extradition treaty as the final sentence of Article 16, paragraph (1):

"The facilities of the International Criminal Police Organization (Interpol) may be used to transmit such a request."

## Article 4

Pursuant to Article 7 of the U.S.- EU Extradition Agreement, the following text is inserted into the bilateral extradition treaty as Article 16, paragraph (5):

"(5) The Requesting State may satisfy its obligation to transmit its request for extradition and supporting documents through the diplomatic channel pursuant to Article 14, paragraph (1), by submitting the request and documents to the Embassy of the Requested State located in the Requesting State. In that case, the date of receipt of such request by the Embassy shall be considered to be the date of receipt by the Requested State for purposes of applying the time limit that must be met under paragraph (4) of the present Article to enable the person's continued detention. "

The current paragraph (5) is renumbered to become paragraph (6).

## Article 5

Pursuant to Article 10 of the U.S.- EU Extradition Agreement, Article 17 of the bilateral extradition treaty is amended to read as follows:

"Article 17

Requests for Extradition or Surrender Made by Several States

(1) If the Requested State receives requests from the Requesting State and from any other State or States for the extradition of the same person either for the same offense or for different offenses, or if the Federal Republic of Germany receives an extradition

request from the United States of America and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offense or for different offenses, the competent authority of the executive branch of the Requested State shall determine to which State, if any, it will surrender the person.

(2) In making its decision under paragraph (1) of this Article, the Requested State shall consider all of the relevant factors, including, but not limited to, the following:

    a)  whether the requests were made pursuant to a treaty;

    b)  the places where each of the offenses was committed;

    c)  the respective interests of the Requesting States;

    d)  the seriousness of the offenses;

    e)  the nationality of the victim;

    f)  the nationality of the person sought;

    g)  the possibility of any subsequent re-extradition between the Requesting States; and

    h)  the chronological order in which the requests were received from the requesting States.

(3)  If the Requested State reaches a decision at the same time upon extradition to one of the Requesting States and on re-extradition to another Requesting State, it shall communicate that decision on re-extradition to each of the Requesting States."

Article 6

Pursuant to Article 5, paragraph (2) of the U.S.- EU Extradition Agreement, Article 29 of the bilateral extradition treaty is amended to read as follows:

6

"Article 29

Certification

Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization. "Ministry of Justice" shall, for the United States of America, mean the United States Department of Justice; and, for the Federal Republic of Germany, the Federal Ministry of Justice."

Article 7

(1)  In accordance with Article 16 of the U.S.-EU Extradition Agreement, this Supplementary Treaty shall apply to offenses committed before as well as after it enters into force.

(2)  This Supplementary Treaty shall not apply to requests for extradition made prior to its entry into force.

Article 8

(1)  This Supplementary Treaty shall form an integral part of the bilateral extradition treaty.

(2)  This Supplementary Treaty shall be subject to the completion by the United States of America and the Federal Republic of Germany of their respective applicable internal procedures for entry into force. The Contracting Parties shall thereupon notify each other that such internal procedures have been completed.

(3) This Supplementary Treaty shall enter into force on the date of entry into force of the U.S.-EU Extradition Agreement.

(4) In the event of termination of the U.S.-EU Extradition Agreement, this Supplementary Treaty shall be terminated.

DONE at Washington, this 18th day of April 2006, in duplicate, in the English and German languages, both texts being equally authentic.

For the Government of the
United States of America:

For the Government of the
Federal Republic of Germany:

| 100TH CONGRESS 1st Session | SENATE | TREATY DOC. 100-6 |
|---|---|---|

# SUPPLEMENTARY EXTRADITION TREATY WITH THE FEDERAL REPUBLIC OF GERMANY

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

THE SUPPLEMENTARY TREATY TO THE TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE FEDERAL REPUBLIC OF GERMANY CONCERNING EXTRADITION SIGNED AT WASHINGTON ON OCTOBER 21, 1986

Entered into Force on March 11, 1993



ENGLISH TEXT ONLY

JUNE 25, 1987.—Treaty was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate.

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1987

91-118

LETTER OF TRANSMITTAL

---

THE WHITE HOUSE, *June 25, 1987.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Supplementary Treaty to the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition signed at Washington on October 21, 1986. I transmit also, for the information of the Senate, the report of the Department of State with respect to the Supplementary Treaty.

The Supplementary Treaty adds to and amends the Treaty Between the United States and the Federal Republic of Germany Concerning Extradition, signed at Bonn on June 20, 1978. It represents an important step in improving law enforcement cooperation and combating terrorism by excluding from the scope of the political offense exception serious offenses typically committed by terrorists, e.g., murder, manslaughter, kidnapping, use of a destructive device capable of endangering life or causing grievous bodily harm, and attempt or conspiracy to commit the foregoing offenses.

The Supplementary Treaty also will help to improve implementation of the current Extradition Treaty in several other respects.

I recommend that the Senate give early and favorable consideration to the Supplementary Treaty and give its advice and consent to ratification.

RONALD REAGAN.

(III)

LETTER OF SUBMITTAL

————————

DEPARTMENT OF STATE,
*Washington, June 4, 1987.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Supplementary Treaty to the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition signed at Washington on October 21, 1986. I recommend that the Supplementary Treaty be transmitted to the Senate for advice and consent to ratification.

The Supplementary Treaty supplements and amends the Treaty between the United States and the Federal Republic of Germany Concerning Extradition, signed at Bonn on June 20, 1978 (32 UST 1485; TIAS 9785). The Supplementary Treaty Concerning Extradition would exclude specified crimes of violence, typically committed by terrorists, from the scope of the political offense exception to extradition. It therefore represents an important step toward improving law enforcement cooperation and countering the threat of international terrorism and other crimes of violence. In addition, the Supplementary Treaty will help improve implementation of the current Treaty in several other respects.

Article 1(a) of the Supplementary Treaty amends Article 2, paragraph (1) of the current Treaty—the "extraditable offenses" provision—by defining extraditable offenses as offenses which are punishable under the laws of both States, whether dual criminality follows from Federal or State laws. In addition, Article 1(a) of the Supplementary Treaty specifies that dual criminality may include offenses based upon participation in an association whose aims and activities include the commission of extraditable offenses, such as an association involved in racketeering or criminal enterprise under the laws of the United States. Article 1(c) deletes the Appendix to the current Treaty, which lists extraditable offenses.

This amendment furthers the modern practice of permitting extradition for prosecution for any crime punishable under the laws of both contracting Parties for a minimum period of more than one year rather than listing offenses for which extradition may be granted. This obviates the need to renegotiate or supplement the Treaty as new types of criminal activity, such as computer-related crimes or money laundering, become punishable under the laws of both States.

Article 1(b) of the Supplementary Treaty amends Article 6 of the current treaty to specifically enumerate fiscal offenses—offenses in connection with taxes, duties, customs and exchange—for which ex-

(VI)

VI

tradition may be refused if the competent executive authority determines that extradition for any such offense would be contrary to the public policy or other essential interests of the Requested State. The current treaty contains a similar provision but describes the fiscal offenses by reference to the Appendix to the Treaty.

Article 2 of the Supplementary Treaty effectively limits the scope of Article 4 of the current treaty—the political offense exception. It amends article 4, paragraph (3) of the current Treaty by specifying additional crimes which shall not be regarded as political offenses: namely, murder; manslaughter; malicious assault; kidnapping; specified explosives offenses; and conspiracy or attempt to commit any of the foregoing offenses.

In addition, the Supplementary Treaty continues a provision, existing in the current Treaty, that excludes from the reach of the political offense exception any offense for which both the United States and the Federal Republic of Germany have an international obligation to extradite the person or submit his case for prosecution; i.e., aircraft hijacking pursuant to the Convention for the Suppression of Unlawful Seizure of Aircraft, opened for signature at The Hague on December 16, 1970; aircraft sabotage pursuant to the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, opened for signature at Montreal on September 23, 1973; crimes against internationally protected persons, including diplomats, under the Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, opened for signature at New York on December 14, 1973; and hostage taking pursuant to the International Convention against the Taking of Hostages, opened for signature at New York on December 18, 1979. This exclusion will also extend to crimes similarly defined in future multilateral treaties.

Article 3 of the Supplementary Treaty makes an addition to Article 20 of the current Treaty. Article 20 of the current Treaty provides that after a decision on an extradition request has been rendered by a competent court, the Requested State may defer surrender of a person being proceeded against or serving a sentence in the Requested State for a different offense until the proceedings are concluded or the sentence is fully executed. Article 3 of the Supplementary Treaty provides that, alternatively, the Requested State may temporarily surrender the person sought to the Requesting State for prosecution. Therefore, this provision will allow a person serving a long sentence in the Requested State to be tried promptly in the Requesting State and then be returned to complete his sentence. This alternative of temporary surrender is routinely included in our modern extradition treaties.

Article 4 of the Supplementary Treaty provides that the Supplementary Treaty's provisions shall apply to any offense committed, any request made or any person found extraditable before or after the entry into force of the Supplementary Treaty, but shall not apply to an offense committed before the Supplementary Treaty enters into force if the offense in question was not an offense under the laws of both Contracting Parties at the time of its commission.

Article 5 of the Supplementary Treaty provides that the Supplementary Treaty shall also apply to Land Berlin, if the Government of the Federal Republic of Germany does not make a contrary dec-

VII

laration within three months of the date of entry into force of the Supplementary Treaty. Article 33 of the current Treaty is substantively identical.

Article 6(1) of the Supplementary Treaty provides that the Supplementary Treaty shall form an integral part of the current Treaty. Article 6(2) of the Supplementary Treaty provides that it shall enter into force upon the exchange of instruments of ratification and shall be subject to termination in the same manner as the current Treaty.

The Department of Justice joins the Department of State in favoring transmission of this Supplementary Treaty to the State at the earliest possible date.

Respectfully submitted,

GEORGE P. SHULTZ.

SUPPLEMENTARY TREATY TO THE TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE FEDERAL REPUBLIC OF GERMANY CONCERNING EXTRADITION

*The United States of America and the Federal Republic of Germany,*

*Desiring* to make more effective the Treaty of June 20, 1978 between the United States of America and the Federal Republic of Germany concerning Extradition (hereinafter referred to as "the Extradition Treaty"),

*Have agreed as follows:*

### ARTICLE 1

(a) Article 2, paragraph (1) of the Extradition Treaty is amended to read as follows:

"(1) Extraditable offenses under the Treaty are offenses which are punishable under the laws of both Contracting Parties. In determining what is an extraditable offense it shall not matter whether or not the laws of the Contracting Parties place the offense within the same category of offense or denominate an offense by the same terminology, or whether dual criminality follows from Federal, State or Laender laws. In particular, dual criminality may include offenses based upon participation in an association whose aims and activities include the commission of extraditable offenses, such as a criminal society under the laws of the Federal Republic of Germany or an association involved in racketeering or criminal enterprise under the laws of the United States."

(b) Article 6 of the Extradition Treaty is amended to read as follows:

"Extradition may be refused for offenses in connection with taxes, duties, customs and exchange if the competent executive authority of the Requested State determines that extradition for any such offense would be contrary to the public policy or other essential interests of the Requested State."

(c) The Appendix to the Extradition Treaty is hereby deleted.

### ARTICLE 2

Article 4, paragraph (3) of the Extradition Treaty is amended to read as follows:

"For the purpose of this Treaty the following offenses shall not be deemed to be offenses within the meaning of paragraph (1):

(a) an offense for which both Contracting Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit his case to their competent authorities for decision as to prosecution;

(b) murder, manslaughter, maliciously wounding, or inflicting grievous bodily harm;

(1)

2

(c) kidnapping, abduction, or any form of unlawful detention, including taking a hostage;

(d) placing or using an explosive, incendiary or destructive device capable of endangering life, or of causing grievous bodily harm, or of causing substantial property damage;

(e) an attempt or conspiracy to commit, or participation in, any of the foregoing offenses."

### ARTICLE 3

The title of Article 20 of the Extradition Treaty is amended to read as follows: "Temporary or Deferred Surrender." The text of Article 20 is renumbered to become Article 20, paragraph (1), and the following text is inserted as Article 20, paragraph (2):

"(2) Alternatively, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution. The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State after conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the Contracting Parties."

### ARTICLE 4

This Supplementary Treaty shall apply to any offense committed, and to any request made, or to any person found extraditable, before or after this Supplementary Treaty enters into force, provided that this Supplementary Treaty shall not apply to an offense committed before this Supplementary Treaty enters into force which was not an offense under the laws of both Contracting Parties at the time of its commission.

### ARTICLE 5

(1) This Supplementary Treaty shall also apply to Land Berlin provided that the Government of the Federal Republic of Germany does not make a contrary declaration to the Government of the United States of America within three months of the date of entry into force of this Supplementary Treaty.

(2) Upon the application of this Supplementary Treaty to Land Berlin, references in the Supplementary Treaty to the Federal Republic of Germany or to the territory thereof shall be deemed also to be references to Land Berlin.

### ARTICLE 6

(1) This Supplementary Treaty shall form an integral part of the Extradition Treaty.

(2) This Supplementary Treaty shall be subject to ratification and the instruments of ratification shall be exchanged at Bonn as soon as possible. It shall enter into force upon the exchange of instruments of ratification. It shall be subject to termination in the same manner as the Extradition Treaty.

In witness whereof, the undersigned, being duly authorized thereto by their respective Governments, have signed this Supplementary Treaty.

3

Done at Washington this twenty-first day of October 1986, in du-
plicate, in the English and German languages, both texts being
equally authentic.

FOR THE UNITED STATES
OF AMERICA:

George P. Shultz

FOR THE FEDERAL REPUBLIC
OF GERMANY:

## TREATIES AND OTHER INTERNATIONAL ACTS SERIES 9785

# EXTRADITION

Treaty Between the
UNITED STATES OF AMERICA
and the FEDERAL REPUBLIC
OF GERMANY

Signed at Bonn June 20, 1978

*with*

Protocol

ENGLISH TEXT ONLY



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89–497, approved
July 8, 1966 (80 Stat. 271; 1 U.S.C. 113)—

". . . the Treaties and Other International Acts
Series issued under the authority of the Secretary of
State shall be competent evidence . . . of the treaties,
international agreements other than treaties, and proc-
lamations by the President of such treaties and inter-
national agreements other than treaties, as the case
may be, therein contained, in all the courts of law
and equity and of maritime jurisdiction, and in all the
tribunals and public offices of the United States, and
of the several States, without any further proof or
authentication thereof."

*For sale by the Superintendent of Documents, U.S. Government Printing Office,
Washington, D.C. 20402.*

# FEDERAL REPUBLIC OF GERMANY

## Extradition

*Treaty signed at Bonn June 20, 1978;*
*Transmitted by the President of the United States of America to the*
*Senate January 19, 1979 (S. Ex. A, 96th Cong., 1st Sess.);*
*Reported favorably by the Senate Committee on Foreign Relations*
*November 20, 1979 (S. Ex. Rep. No. 96–20, 96th Cong., 1st*
*Sess.);*
*Advice and consent to ratification by the Senate November 29, 1979;*
*Ratified by the President December 20, 1979;*
*Ratified by the Federal Republic of Germany June 20, 1980;*
*Ratifications exchanged at Washington July 30, 1980;*
*Proclaimed by the President August 9, 1980;*
*Entered into force August 29, 1980.*
*With protocol.*

———————

By the President of the United States of America

## A PROCLAMATION

Considering that:

The Treaty between the United States of America and the Federal Republic of Germany Concerning Extradition was signed at Bonn on June 20, 1978, the text of which, in the English and German languages, is hereto annexed;

The Senate of the United States of America by its resolution of November 29, 1979, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty;

The Treaty was ratified by the President of the United States of America on December 20, 1979, in pursuance of the advice and consent of the Senate, and was duly ratified on the part of the Federal Republic of Germany;

It is provided in Article 34 of the Treaty that the Treaty shall enter into force thirty days after the exchange of the instruments of ratification;

The instruments of ratification of the Treaty were exchanged at Washington on July 30, 1980; and accordingly the Treaty will enter into force on August 29, 1980;

2

Now, THEREFORE, I, Jimmy Carter, President of the United States of America, proclaim and make public the Treaty, to the end that it shall be observed and fulfilled with good faith on and after August 29, 1980, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this ninth day of August in the year of our Lord one thousand nine hundred eighty and [SEAL] of the Independence of the United States of America the two hundred fifth.

JIMMY CARTER

By the President:
   WARREN CHRISTOPHER
         *Acting Secretary of State*

TIAS 9785

3

TREATY

between

The United States of America

and

the Federal Republic of Germany

Concerning Extradition

4

The United States of America

and

the Federal Republic of Germany –

desiring to provide for more effective cooperation between
the two States in the repression of crime and, specifically,
newly to regulate and thereby to facilitate the relations
between the two States in the area of extradition –

have agreed as follows:

<u>Article 1</u>

Obligation to Extradite

(1) The Contracting Parties agree to extradite to each
    other subject to the provisions described in this
    Treaty persons found in the territory of one of
    the Contracting Parties who have been charged with
    an offense or are wanted by the other Contracting
    Party for the enforcement of a judicially pronounced
    penalty or detention order for an offense committed
    within the territory of the Requesting State.

(2) When the offense has been committed outside the
    territory of the Requesting State, the Requested
    State shall grant extradition subject to the pro-
    visions described in this Treaty if either

    a) its laws would provide for the punishment of
       such an offense committed in similar circum-
       stances, or

TIAS 9785

5

b) the person whose extradition is requested is
   a national of the Requesting State.

### Article 2

#### Extraditable Offenses

(1) Extraditable offenses under this Treaty are:

a) Offenses described in the Appendix to this
   Treaty which are punishable under the laws
   of both Contracting Parties;

b) Offenses, whether listed in the Appendix to
   this Treaty or not, provided they are punish-
   able under the Federal laws of the United
   States and the laws of the Federal Republic
   of Germany.

In this connection it shall not matter whether or
not the laws of the Contracting Parties place the
offense within the same category of offenses or
denominate an offense by the same terminology.

(2) Extradition shall be granted in respect of an ex-
traditable offense:

a) For prosecution, if the offense is punishable
   under the laws of both Contracting Parties by

6

deprivation of liberty for a maximum period
exceeding one year, or

b) For the enforcement of a penalty or a deten-
tion order, if the duration of the penalty
or detention order still to be served, or
when, in the aggregate, several such penalties
or detention orders still to be served, amount
to at least six months.

(3) Subject to the conditions set out in paragraphs
(1) and (2), extradition shall also be granted:

a) For attempts to commit, conspiracy to commit,
or participation in, an extraditable offense;

b) For any extraditable offense when, only for
the purpose of granting jurisdiction to the
United States Government, transportation,
transmission of persons or property, the
use of the mails or other means of communi-
cation or use of other means of carrying out
interstate or foreign commerce is also an
element of the specific offense.

(4) When extradition has been granted in respect of
an extraditable offense, it shall also be granted
in respect of any other extraditable offense which
would otherwise not be extraditable only by reason
of the operation of paragraph (2).

7

## Article 3

### Territorial Application

(1) A reference in this Treaty to the territory of a
Contracting Party is a reference to all territory
under its jurisdiction.

(2) A reference in this Treaty to the territory of a
Contracting Party shall furthermore include its
territorial waters and airspace and vessels and
aircraft registered with the competent authority
of this Contracting Party if any such vessel is
on the high seas or if any such aircraft is in
flight when the offense is committed.  For the
purpose of this Treaty an aircraft shall be con-
sidered to be in flight at any time from the moment
when all its external doors are closed following
embarkation until the moment when any such door is
opened for disembarkation.

## Article 4

### Political Offenses

(1) Extradition shall not be granted if the offense in
respect of which it is requested is regarded by the
Requested State as a political offense, an offense
of a political character or as an offense connected
with such an offense.

TIAS 9785

68-940 O - 80 - 2

8

(2) Extradition also shall not be granted if the Requested State has substantial grounds for believing that the request for extradition has, in fact, been made with a view to try or punish the person sought for an offense mentioned in paragraph (1).

(3) For the purpose of this Treaty the following offenses shall not be deemed to be offenses within the meaning of paragraph (1):

a) A murder or other willful crime, punishable under the laws of both Contracting Parties by a penalty of at least one year, against the life or physical integrity of a Head of State or Head of Government of one of the Contracting Parties or of a member of his family, including attempts to commit such an offense, except in open combat;

b) An offense which the Contracting Parties or the Requesting State have the obligation to prosecute by reason of a multi-lateral international agreement.

### Article 5

### Military Offenses

Extradition shall not be granted if the offense in respect of which it is requested is purely a military offense.

TIAS 9785

9

### Article 6

Fiscal Offenses

If the competent executive authority of the Requested State determines that an offense for which extradition has been requested represents an offense as described in Item No. 27 of the Appendix to this Treaty and that extradition for such an offense would be contrary to the public policy or other essential interests of that State, extradition may be refused even though the offense also falls into one of the other categories of extraditable offenses under this Treaty.

### Article 7

Extradition of Nationals

(1) Neither of the Contracting Parties shall be bound to extradite its own nationals. The competent executive authority of the Requested State, however, shall have the power to grant the extradition of its own nationals if, in its discretion, this is deemed proper to do and provided the law of the Requested State does not so preclude.

(2) The Requested State shall undertake all available legal measures to suspend naturalization proceedings in respect of the person sought until a decision on the request for his extradition and, if that request is granted, until his surrender.

TIAS 9785

10

(3) If the Requested State does not extradite its own
    national, it shall, at the request of the Requesting
    State, submit the case to its competent authorities
    in order that proceedings may be taken if they are
    considered appropriate.  If the Requested State re-
    quires additional documents or evidence, such docu-
    ments or evidence shall be submitted without charge
    to that State.  The Requesting State shall be informed
    of the result of its request.


## Article 8

### Prior Jeopardy for Same Offense

Extradition shall not be granted when the person whose
extradition is requested has been tried and discharged
or punished with final and binding effect by the com-
petent authorities of the Requested State for the
offense for which his extradition is requested.


## Article 9

### Lapse of Time

Extradition shall not be granted if at the time the Re-
quested State receives the request for extradition the
prosecution, or the enforcement of the penalty or of
the detention order, has become barred by lapse of time
under the law of the Requesting State.


TIAS 9785

11

## Article 10

### Jurisdiction of the Requested State

(1) Extradition may be refused if the person sought
    is proceeded against in the Requested State for
    the offense for which extradition is requested.

(2) The fact that the competent authorities of the
    Requested State have decided not to prosecute
    the person sought for the offense for which ex-
    tradition is requested or decided to discontinue
    any criminal proceedings which have been initiated
    shall not preclude extradition.

## Article 11

### Complaint and Authorization

The obligation to extradite shall not be affected by the
absence of any complaint or any authorization as a result
of an offense if such complaint or such authorization is
required under the law of the Requested State.

## Article 12

### Capital Punishment

When the offense for which extradition is requested is
punishable by death under the laws of the Requesting State

TIAS 9785

12

and the laws of the Requested State do not permit such
punishment for that offense, extradition may be refused
unless the Requesting State furnishes such assurances as
the Requested State considers sufficient that the death
penalty shall not be imposed, or, if imposed, shall not
be executed.

### Article 13

#### Extraordinary Courts

(1) An extradited person shall not be tried by an
extraordinary court in the territory of the Re-
questing State.

(2) Extradition shall not be granted for the enforce-
ment of a penalty imposed, or detention ordered,
by an extraordinary court.

### Article 14

#### Channel of Communication; Extradition Documents

(1) The request for extradition, any subsequent docu-
ments and all other communications shall be trans-
mitted through the diplomatic channel unless otherwise
provided by this Treaty.

(2) The request shall be accompanied by:

TIAS 9785

13

    a) All available information concerning the
       identity and nationality of the person sought;

    b) The text of all applicable provisions of law
       of the Requesting State concerning the definition
       of the offense, its punishment and the limitation
       of legal proceedings or the enforcement of penal-
       ties; and

    c) A statement by a competent authority describing
       the measures taken, if any, that have interrupted
       the period of limitation under the law of the
       Requesting State.

(3) A request for the extradition of a person sought for
    the purpose of prosecution shall be accompanied, in
    addition to the documents provided for in paragraph
    (2), by:

    a) A warrant of arrest issued by a judge of the
       Requesting State and such evidence as, according
       to the law of the Requested State, would justify
       his arrest and committal for trial if the offense
       had been committed there, including evidence
       proving that the person requested is the person
       to whom the warrant of arrest refers; and

    b) A summary statement of the facts of the case
       unless they appear from the warrant of arrest.

TIAS 9785

14

(4) A request for the extradition of a person sought by reason of a judgment of guilt for the imposition or enforcement of a penalty or detention order shall be accompanied, in addition to the documents provided for in paragraph (2), by:

    a) If the judgment handed down in the territory of the Requesting State contains only a determination of guilt, this judgment, confirmation that the judgment has final and binding effect and a warrant of arrest issued by a competent authority of the Requesting State;

    b) If the judgment handed down in the territory of the Requesting State contains the determination of guilt and the sentence imposed, a copy of this judgment of conviction as well as the confirmation that this judgment has final and binding effect and is enforceable and a statement of the portion of the sentence that has not been served.

(5) A witness' statement taken down in writing or other evidence, not under oath, shall be admitted in evidence as a statement made or evidence given under oath if it is certified that the person making the statement or giving the evidence was warned by a competent authority that any false, misleading or incomplete declaration would render him liable to punishment.

TIAS 9785

15

<u>Article 15</u>

Additional Evidence

(1) If the Requested State considers that the evidence
furnished in support of the request for the extra-
dition of a person sought is not sufficient to fulfill
the requirements of this Treaty, that State shall re-
quest the submission of necessary additional evidence;
it may fix a time limit for the submission of such
evidence and, upon the Requesting State's application,
for which reasons shall be given, may grant a
reasonable extension of the time limit.

(2) If the person sought is under arrest and the addi-
tional evidence or information submitted as aforesaid
is not sufficient, or if such evidence or information
is not received within the period specified by the
Requested State, he shall be discharged from custody.
However, such discharge shall not bar a subsequent
request in respect of the same offense.  In this
connection it shall be sufficient if reference is
made in the subsequent request to the supporting
documents already submitted provided these documents
will be available at the extradition proceedings on
this subsequent request.

TIAS 9785

68-940 O - 80 - 4

16

## Article 16

Provisional Arrest

(1) In case of urgency either Contracting Party may apply for the provisional arrest of the person sought before the request for extradition has been submitted to the Requested State through the diplomatic channel. The request for provisional arrest may be made either through the diplomatic channel or directly between the United States Department of Justice and the Minister of Justice of the Federal Republic of Germany.

(2) The application for provisional arrest shall state that a warrant of arrest as mentioned in paragraph (3) a) of Article 14, or a judgment as mentioned in paragraph (4) a) or b) of Article 14, exists and that it is intended to make a request for extradition. It shall also state the offense for which extradition will be requested and when and where such offense was committed and shall give all available information concerning the description of the person sought and his nationality. The application shall also contain such further information, if any, as would be necessary to justify the issuance of a warrant of arrest in the Requested State had the offense been committed, or the person sought been convicted, in that State.

TIAS 9785

17

(3) On receipt of an application for provisional arrest
    the Requested State shall take the necessary steps
    to secure the arrest of the person sought.

(4) Provisional arrest shall be terminated if, within
    a period of 40 days after the apprehension of the
    person sought, the Requested State has not received
    the request for extradition and the documents men-
    tioned in Article 14.  This period may be extended,
    upon the Requesting State's application, for up to
    an additional 20 days after the apprehension of the
    person sought.

(5) The termination of provisional arrest pursuant to
    paragraph (4) shall not prejudice the extradition of
    the person sought if the extradition request and the
    supporting documents mentioned in Article 14, insofar
    as they were not submitted in a timely manner, are
    later delivered.  In this connection, reference may
    be made to the extradition request and the supporting
    documents which have already been transmitted to the
    Requested State.

## Article 17

Requests for Extradition Made by Several States

(1) A Contracting Party which has received concurrently
    requests for the extradition of the same person either
    for the same offense, or for different offenses, from

TIAS 9785

18

the other Contracting Party and from a third State
shall make its decision having regard to all the cir-
cumstances and especially the possibility of a sub-
sequent re-extradition to another Requesting State,
the relative seriousness and place of commission of
the offenses, the nationality of the person sought
and the provisions of any extradition agreements
between the Requested State and the Requesting States.

(2) If the Requested State reaches a decision at the
same time upon extradition to one of the Requesting
States and on re-extradition to another Requesting
State, it shall communicate that decision on
re-extradition to each of the Requesting States.

## Article 18

### Simplified Extradition

If the extradition of a person sought to the Requesting
State is not obviously precluded by the laws of the Re-
quested State and provided the person sought irrevocably
agrees in writing to his extradition after personally
being advised by a judge or competent magistrate of his
rights to formal extradition proceedings and the protection
afforded by them that he would lose, the Requested State
may grant his extradition without a formal extradition
proceeding having taken place.  In this case Article 22(1)
shall not be applicable.

TIAS 9785

19

## Article 19

Decision

(1) The Requested State shall promptly communicate
    to the Requesting State the decision on the request
    for extradition.

(2) The Requested State shall give the reasons for any
    complete or partial rejection of the request for
    extradition.

## Article 20

Delayed Decision and Surrender

The Requested State may, after a decision on the request
has been rendered by a competent court, defer the surrender
of the person whose extradition is requested, when that
person is being proceeded against or is serving a sentence
in the territory of the Requested State for a different
offense, until the conclusion of the proceedings and the
full execution of any punishment he may be or may have
been awarded.  In this case the Requested State shall
advise the Requesting State.

20

## Article 21

### Surrender of the Person Sought

(1) If the extradition has been granted, surrender
of the person sought shall take place within such
time as may be prescribed by the laws of the Re-
quested State.  If no time period for surrender is
prescribed by the laws of the Requested State,
surrender shall take place within 30 days from
the date on which the Requesting State has been
notified that the extradition has been granted.
The competent authorities of the Contracting
Parties shall agree on the time and place of the
surrender of the person sought.

(2) If the person sought is not removed from the terri-
tory of the Requested State within the time required
under paragraph (1), he may be set at liberty.  The
Requested State may subsequently refuse to extradite
the person sought for the same offense.

(3) If circumstances beyond its control prevent a Con-
tracting Party from timely surrendering or taking
delivery of the person to be extradited, it shall
notify the other Contracting Party before the ex-
piration of the time limit.  In such a case the
competent authorities of the Contracting Parties
may agree upon a new date for the surrender.

TIAS 9785

21

### Article 22

Rule of Speciality

(1) A person who has been extradited under this Treaty
shall not be proceeded against, sentenced or de-
tained with a view to carrying out a sentence or
detention order for any offense committed prior to
his surrender other than that for which he was
extradited, nor shall he be for any other reason
restricted in his personal freedom, except in
the following cases:

a) When the State which extradited him consents
thereto. A request for consent shall be sub-
mitted, accompanied by the documents mentioned
in Article 14 and a record established by a
judge or competent officer of the statement
made by the extradited person in respect of
the request for consent. If under the law
of the Requesting State the issuance of a
warrant of arrest for the offense for which
extradition is sought is not possible, the
request may instead be accompanied by a
statement issued by a judge or competent
officer establishing that the person sought
is strongly suspected of having committed
the offense.

22

b) When such person, having had the opportunity
to leave the territory of the State to which
he has been surrendered, has not done so
within 45 days of his final discharge or
has returned to that territory after leaving
it. A discharge under parole or probation
without an order restricting the freedom of
movement of the extradited person shall be
deemed equivalent to a final discharge.

(2) The State to which the person has been extradited
may, however, take any legal measures necessary
under its law, in order to proceed in absentia,
to interrupt any lapse of time or to record a
statement under paragraph (1) a).

(3) If the offense for which the person sought was
extradited is legally altered in the course of
proceedings, he shall be prosecuted or sentenced
provided the offense under its new legal descrip-
tion is:

a) Based on the same set of facts contained in
the extradition request and its supporting
documents; and

b) Punishable by the same maximum penalty as,
or a lesser maximum penalty than, the
offense for which he was extradited.

TIAS 9785

23

## Article 23

### Re-extradition to a Third State

(1) Except as provided for in Article 22 (1) b), the
Requesting State shall not, without the consent of
the Requested State, re-extradite to a third State
a person extradited to the Requesting State and
sought by the said third State in respect of an
offense committed prior to his surrender.

(2) A request for consent to re-extradition to a third
State shall be accompanied by the documents sup-
porting the request for extradition made by the
third State, if the Requested State needs these
documents for its decision.  These documents shall
conform to the documents mentioned in Article 14
of this Treaty.

## Article 24

### Information on the Result of the Criminal Proceedings

The Requesting State shall upon demand inform the Re-
quested State of the result of the criminal proceedings
against the extradited person and send a copy of the
final and binding decision to that State.

TIAS 9785

24

<u>Article 25</u>

Surrender of Property

(1) To the extent permitted under the laws of the
    Requested State and subject to the rights of that
    State or of third parties, which shall be duly re-
    spected, all articles which may serve as evidence,
    or which have been acquired as a result of an
    offense, or have been obtained as consideration
    for such articles, and which at the time of the
    arrest are found in the possession of the person
    sought or are discovered subsequently, shall be
    surrendered if extradition of the person sought
    is granted.  Surrender of such articles shall be
    possible even without any special request and,
    if possible, at the same time that the person
    sought is surrendered.

(2) Subject to the conditions provided in paragraph
    (1), the articles mentioned therein shall be
    surrendered even if the person sought cannot be
    surrendered owing to his death or escape.

(3) The Requested State may condition the surrender
    of articles upon a satisfactory assurance from
    the Requesting State that the articles will be
    returned to the Requested State as soon as possible.

TIAS 9785

25

<u>Article 26</u>

Transit

(1) Transit of a person who is the subject of extra-
dition from a third State through the territory
of a Contracting Party to the territory of the
other Contracting Party shall be granted on sub-
mission of a request, provided that the offense
concerned is an extraditable offense under Article
2 and that the Contracting Party requested to
grant transit does not consider the offense to be
one covered by Articles 4 or 5.

(2) Transit of a national of the Requested State
may be refused if, in the opinion of that State,
it is inadmissible under its law.

(3) Subject to the provisions of paragraph (4), the
request for transit must be accompanied by a
warrant of arrest issued by a judge or competent
officer of the Requesting State and by a statement
as mentioned in Article 14 (3) b).

(4) If air transport is used, the following provisions
shall apply:

26

a) When no intermediate stop is foreseen, the
   Contracting Party requesting transit shall
   notify the other Contracting Party, certify
   that one of the documents mentioned in
   Article 14, paragraph (3) a) or paragraph
   (4) a) or b) exists, and state whether
   the person whose transit is being notified
   is a national of the Contracting Party over
   the territory of which the flight is to be
   made.  In the case of an unscheduled landing
   such notification shall have the effect of
   a request for provisional arrest as provided
   for in Article 16; thereafter a formal re-
   quest for transit shall be made.

b) When an intermediate stop is planned, the
   Contracting Party requesting transit shall
   submit a formal request for transit.

### Article 27

Applicable Law

Except where this Treaty otherwise provides, the law
of the Requested State shall be applicable with respect
to provisional arrest, extradition and transit.

TIAS 9785

27

### Article 28

#### Language to be Used

The documents transmitted in the application of this
Treaty shall be in the language of the Requesting State
accompanied by a certified translation into the language
of the Requested State.  The expense of translation
shall be borne by the Requesting State.

### Article 29

#### Certification

A warrant of arrest and depositions or other evidence,
given on oath or in a manner described in Article 14
(5), and the judgment of conviction and of the sentence,
if it has been passed, or certified copies of these
documents, shall be admitted in evidence in the exami-
nation of the request for extradition when:

    a) In the case of a request emanating from the
       Federal Republic of Germany, they are signed
       by a judge or competent officer, are authen-
       ticated by the official seal of the Federal
       Minister of Justice and are certified by
       the competent diplomatic or consular officer
       of the United States in the Federal Republic
       of Germany, or

28

b) In the case of a request emanating from the
United States, they are signed by a judge
or competent officer, are authenticated by
the official seal of the Department of State
and are certified by the competent diplomatic
or consular officer of the Federal Republic
of Germany in the United States.

### Article 30

#### Expenses

Expenses arising from the transportation of a person
sought to the Requesting State shall be borne by that
State.  No other pecuniary claim arising from an extra-
dition or a transit request shall be made by the Re-
quested State against the Requesting State.  The
appropriate legal officers of the State in which the
extradition proceedings take place shall, by all legal
means within their power, assist the Requesting State
before the competent judges and officers.

### Article 31

#### Scope of Application

This Treaty shall apply to offenses encompassed by
Article 2 committed before as well as after the date
this Treaty enters into force.  Extradition shall not
be granted, however, for an offense committed before
this Treaty enters into force which was not an offense
under the laws of both Contracting Parties at the time
of its commission.

TIAS 9785

29

## Article 32

### Definitions

For the purpose of this Treaty, the term

   a) "Penalty" means deprivation of liberty as a
      result of a sentence upon conviction for an
      offense;

   b) "Detention order" means any order involving
      deprivation of liberty which has been made by
      a criminal court in addition to or instead of
      a penalty.

## Article 33

### Berlin Clause

(1) This Treaty shall also apply to Land Berlin pro-
    vided that the Government of the Federal Republic
    of Germany does not make a contrary declaration to
    the Government of the United States of America
    within three months of the date of entry into force
    of this Treaty.

(2) Upon the application of this Treaty to Land Berlin,
    references in the Treaty to the Federal Republic of
    Germany or to the territory thereof shall be deemed
    also to be references to Land Berlin.

30

### Article 34

Ratification; Coming Into Force; Denunciation

(1) This Treaty shall be subject to ratification; the
     instruments of ratification shall be exchanged in
     Washington, D.C., as soon as possible.

(2) This Treaty shall enter into force 30 days after
     the exchange of the instruments of ratification.[1]

(3) Between the Contracting Parties this Treaty shall
     terminate and replace the Extradition Treaty
     between the United States of America and Germany
     signed at Berlin July 12, 1930.[2]

(4) This Treaty shall continue in force until the
     expiration of one year from the date on which
     written notice of termination is given by one
     Contracting Party to the other.

Done at Bonn this 20th day of June, 1978, in duplicate
in the English and German languages, both texts being
equally authentic.

For the                       For the
United States of America      Federal Republic of Germany

_Walter J. Stoessel_ [3]      _signature_ [4]

                              _signature_ [5]

---

[1] Aug. 29, 1980.
[2] TS 836; 47 Stat. 1862.
[3] Walter J. Stoessel, Jr.
[4] Guenther Van Well.
[5] Guenther Erkel.

TIAS 9785

31

## APPENDIX

1.  Murder.

2.  Manslaughter.

3.  Aggravated wounding, injury, or assault, even when loss of life results; wounding or injuring with intent to cause grievous bodily harm.

4.  Illegal abortion.

5.  Kidnapping; abduction; false imprisonment; child-stealing.

6.  Rape, indecent assault; incest; bigamy.

7.  Unlawful sexual acts with or upon children under the age specified by the laws both of the Requesting and Requested States.

8.  Procuration.

9.  Libel.

10. Willful non-support or willful abandonment of a minor or other dependent person when by reason of such non-support or abandonment the life of that minor or other dependent person is or is likely to be endangered.

11. Robbery; larceny; burglary; embezzlement; extortion.

12. Malicious damage to property.

13. Fraud, including offenses against the laws relating to the unlawful obtaining of money, property or securities, to fiduciary relationships or to exploitation of minors.

TIAS 9785

32

14. Offenses against the laws relating to forgery, including the making of forged documents or records, whether official or private, or the uttering or fraudulent use of such documents or records.

15. Receiving, possessing, or transporting for personal benefit any money, valuable securities, or other property, knowing the same to have been unlawfully obtained.

16. Offenses relating to counterfeiting.

17. Perjury, including subornation of perjury; false statements, either written or oral, whether or not under oath, made to a judicial authority or to a government agency or office.

18. Arson.

19. Unlawful obstruction of juridical proceedings or proceedings before governmental bodies or interference with an investigation of a violation of a criminal statute, by influencing, bribing, impeding, threatening, or injuring by any means any officer of the court, juror, witness, or duly authorized criminal investigator.

20. a) Unlawful abuse of official authority which results in bodily injury or deprivation of life, liberty or property of any person.

b) Unlawful injury or intimidation in connection with, or interference with, voting or candidacy for public office, jury service, government employment, or the receipt or enjoyment of benefits provided by government agencies.

TIAS 9785

33

21. Facilitating or permitting the escape of a person
    from custody; prison mutiny.

22. Offenses against the laws relating to bribery.

23. Offenses against the laws relating to civil disorders.

24. Offenses against the laws relating to illegal gambling
    enterprises.

25. Any act willfully jeopardizing the safety of any
    person traveling upon a railway or in any aircraft
    or vessel or other means of transportation.

26. Piracy, by statute or by the law of nations; mutiny
    or revolt aboard an aircraft or vessel against the
    authority of the captain or commander of such air-
    craft or vessel; any seizure or exercise of control,
    by force or violence or threat of force or violence,
    of an aircraft or vessel.

27. a) Offenses against the laws relating to importa-
       tion, exportation or transit of goods, articles,
       or merchandise.

    b) Offenses relating to willful evasion of taxes
       and duties.

    c) Offenses against the laws relating to interna-
       tional transfers of funds.

28. Offenses against the bankruptcy laws.

29. Offenses against the laws relating to narcotic drugs,
    Cannabis sativa L., Hallucinogenic drugs, cocaine and
    its derivatives, and other dangerous drugs and chemicals.

30. Offenses against the laws relating to the illicit
    manufacture of or traffic in poisonous chemicals or
    substances injurious to health.

TIAS 9785

34

31. Offenses against the laws relating to firearms, ammuni-
tion, explosives, incendiary devices or nuclear materials.

32. Offenses against the laws relating to the sale or trans-
portation or purchase of securities or commodities.

33. Any other act for which extradition may be granted in
accordance with the laws of both Contracting Parties.

TIAS 9785

35

PROTOCOL

At the time of signing this day of the Extradition
Treaty between the United States of America and the
Federal Republic of Germany the undersigned plenipoten-
tiaries have agreed that Article 4(3)(b) of the Treaty
and Item No. 20(b) of the Appendix thereto are to be
interpreted as follows:

(1) With respect to the interpretation of Article
    4(3)(b) the Contracting Parties mutually agree that
    at the time of the conclusion of the Treaty, this
    provision has reference, for example, to the Conven-
    tion for the Suppression of Unlawful Seizure of
    Aircraft of December 16, 1970, [1] the Convention for
    the Suppression of Unlawful Acts Against the Safety
    of Civil Aviation of September 23, 1971, [2] and the
    Convention on the Prevention and Punishment of
    Crimes Against Internationally Protected Persons
    including Diplomatic Agents of December 14, 1973. [3]

(2) The Contracting Parties mutually agree to interpret
    Item No. 20(b) of the Appendix to the Treaty as
    meaning that the terms "jury service" and "ehren-
    amtlicher Richter" apply to persons who in the
    legal practice of both Contracting Parties have
    corresponding functions (in the United States of
    America: members of a jury; in the Federal Republic
    of Germany: members of a court who are not judges by
    profession).

---

[1] TIAS 7192; 22 UST 1641.
[2] TIAS 7570; 24 UST 564.
[3] TIAS 8532; 28 UST 1975.

TIAS 9785

36

Done at Bonn this 20th day of June, 1978, in duplicate
in the English and German languages, both texts being
equally authentic.


For the                     For the
United States of America    Federal Republic of Germany

TIAS 9785